The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the 4th Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. I want to welcome everyone to the 4th Circuit Court of Appeals this morning in this magnificent courtroom. We have four interesting cases, good lawyers. Mr. Abeles? Yes, Your Honor. Good to have you. This is the Justin Wolfe v. Dotson. Yes, Your Honor. I have a recollection that Mr. Wolfe's case has been here before. A number of times, sir. Good to have you with us, sir. It's good to be here. Thank you. Are you ready for my argument, Your Honor? You may proceed. May it please the Court, it's not contested in this appeal that the government chased Owen Barber, the petitioner Justin Wolfe, star witness off the stand and intimidated him into silence during its interview with him. The government just says it doesn't matter because, for one thing, your client ultimately pled guilty. And for another thing, the most recent declaration of Mr. Barber is not new. Is that right? That's right. That's right, Your Honor. So that is their contention. Our argument, I'm sorry, go ahead. So what about the fact that Mr. Wolfe ultimately pled guilty? Sure. So, you know, the courts, we cited a number of cases saying that does not preclude us from making an actual innocence showing. I understand that the guilty plea is a factor that can be considered by the judge on the merits of the actual innocence during that inquiry. But it's not dispositive, and we have a number of arguments that we would like to present attacking that guilty plea as involuntary under both our vindictive prosecution theory and our witness intimidation theory. And so while it's not contested that there was witness intimidation here because this issue arrives to us under Rule 12b-6, what is contested is how to characterize evidence that is later put forward by a suppressed witness for purposes of an actual innocence inquiry. The director says that such evidence must be newly discovered. We say it must be newly available. And I think this appeal comes down to who's right on that question. This is a judge-made doctrine, actual innocence, and the rules come from the court in terms of new evidence. We start with Schlupp. The Schlupp case is the one that gave us this doctrine, and it did not involve newly discovered evidence. What happened in Schlupp was that there was an alibi witness. He was available to testify at trial. But Schlupp's lawyer was alleged to be ineffective, and so he did not call this witness who was not newly discovered, but that was new evidence. That was new evidence in Schlupp. In House v. Bell, similar. There were bloodstain evidence that was available at trial, was not newly discovered, but was characterized by the Supreme Court as new evidence. It was evidence that was not presented in those cases because of a constitutional violation that's held against the state. In those cases, ineffective assistance. In this case, the evidence wasn't available also because of a constitutional violation, at least as we've alleged. What would you have us do with the language in our third go-round on this case, Wolf v. 3, where we said Barber's availability was speculative? Yes. The standard for new evidence here is whether it's reasonably available. There, what the court was looking at at that time was whether it was conceivable that our client, Justin Wolf, could have a fair trial in the Commonwealth of Virginia. It's the highest standard under habeas law, and it was conceivable to the court that Barber could appear. They didn't say he would appear. They said it was conceivable and premature. That's an important point to make. It was premature to determine whether he would show up or not. The court said it would deal with that. First, it needs to be exhausted in the state system, so it wasn't right for adjudication. Otherwise, it would be dealt with on habeas here, now. Since then, hasn't Barber himself, as well as his attorney, reiterated that he would not have testified and there was no hope of immunity in sight? Yes. In Barber's latest declaration, the April 2023 declaration, he says he would have resisted testifying to the fullest extent. Of course, he was under death threats or veiled death threats, I'll call them, at the time, so of course he would have resisted testifying. You're saying death threats that the prosecutors told him they were going to subject him to the death penalty. That's what I mean. If he changed his story. I'm sorry, Your Honor, could you say that again? If he changed his story. If he repudiated his earlier testimony when Wolf was convicted. Yes. That Wolf hired him. Correct, Your Honor. There's no question that Barber's the trigger man. He's been consistent on that. I'm the trigger man. Correct. The question has been whether Wolf was in on it with him. That is the question, right. And during Wolf's first trial, that's the one that this court ended up throwing out eventually. Barber testified against Wolf. He was the star witness. And after this court upheld the habeas ruling in Wolf's favor, the very next day after the mandate came down, that's when they visited Barber in prison. And that's when they started reading Supreme Court cases. The very next day of which case was that? So this is September 10th. The second case or third case? So the first case is in 2009. That's just a case about whether he should get a hearing for actual innocence. And the court said yes. The second case is the one that we're talking about here, Your Honor, where the court affirmed the grant of habeas relief to Mr. Wolf. Is that 2012? September 10th, 2012, the mandate came down. He affirmed Judge Jackson. That's exactly right, Your Honor. Yes. And it was a very strong opinion. It was very embarrassing to the Commonwealth, which was really lambasted by this court. And they then took it out on Barber and Wolf. Those are our allegations. They began a retaliation campaign. That's when they had that interview with him that they recorded, Sheriff, did you say? They recorded their own witness intimidation, yes. Right. So it's not an allegation. There's a recording of it. That's right. That's right, Your Honor, yes. And so in both of those cases, getting back to Schlepp and Bell, the evidence wasn't presented there because of constitutional violations, ineffective assistance. Here it wasn't presented or available also because of constitutional violations that we've been talking about. Now, coming back to this issue of what's the standard, newly discovered or newly available. But here you're trying to – the guilty plea was in 2015. That's right, Your Honor. It was after all this. And he pled guilty to murder. He got up in the guilty plea. It's just in this proceeding. Yes, so there's a guilty plea in this proceeding. I think it's 2016, actually. And Wolf stood up and was put on the road and said, I did it. And you're saying that Wolf lied to the court when he said, I'm guilty of murder. I have to – that's a matter of logic, yes, Your Honor. That's exactly your position here today. And he submitted a letter. Did he not actually, in addition to the plea, he submitted a letter? There was a letter that was submitted with the plea, yes, that the state says was not required. If there's a hearing here, we're going to show that it was, that he was forced to write that letter in order to get his guilty plea approved. And that was to get out from under the death penalty. He was just scared. That's your theory. He had to do a plea this way to get out from under the death penalty. Yeah, he had already been – And also the six additional charges they piled on him after the Commonwealth lost the first time. Yeah, and remember, he had already been sentenced to death once. And so he had a very, very reasonable fear that he was going to be put to death again. And I understand the concern about not being truthful with the court. Of course I understand that. But what we would say is that when it comes to vindictive prosecution, that's the whole point of a vindictive prosecution, to get a guilty plea when you otherwise wouldn't deserve one. It overcomes the will of the defendant. That's what vindictive prosecution means. And that's what happens here. And that's why he submitted those letters. What about the district court's concern about Barber's credibility? So I understand, you know, obviously that kind of thing is going to arise in a murder case. But what I would remind you is that Barber's testimony is corroborated. We submitted additional evidence with our testimony, with Barber's testimony, that from his cellmate, so contemporaneously he had said, no, it was just me, it wasn't Wolf. From his roommate, the guy he lived with, so not a person in jail, he said the same thing. And we had a private investigator at the time who verified. Didn't he testify at some hearing before Judge Jackson? That's my next point. His testimony was already deemed credible. He gave the exculpatory story, right? Exactly. Yes, Your Honor. I did it myself. Wolf was not involved. Yeah. And Judge Jackson specifically found that he was credible. Specifically found him credible and persuasive at a hearing. And Judge Jackson cross-examined Barber at that hearing. So he asked the questions he needed to get asked. And, again, that's after a hearing. This time there was no hearing, and there were these comments about reliability. And, yes, he's gone back and forth a couple of times. But his exculpatory testimony, which is against Barber's interests, by the way. He has no dog in this fight. All he has is risks. Because the state has never ‑‑ now, it's been a long time, of course. But the state has never lifted its threats against him. That if he came forward in these cases on Wolf's behalf, he'd be retried. Retried. And using his confessions against him. So I think, you know, the court is ‑‑ I've got to save three minutes for rebuttal, which is what I have left here. But, you know, I think the court gets it. You know, there was ‑‑ this evidence was not available when Wolf pled guilty. It just wasn't. It was not voluntary. Not on a compelled basis. It later became available. And if there are questions about credibility, let's have everybody into court again. And let's figure out who's being honest. And who's telling the truth here. But we just deserve a chance to make our actual innocence case. Because our case really is very strong. Thank you. Oh, I'm sorry. I actually wanted to ask, it seems that there's a lot of overlap between Barber's declaration in 2005 and the 2023 declaration. So why ‑‑ what is specifically ‑‑ what exactly are you alleging is specifically new? So our argument ‑‑ so I understand your comment, Judge Berner. Our argument is that testimony simply was not available at the time of trial or plea. It's new because it became newly available. At what time? You said the time of trial. At the time he pled guilty. At the time Wolf pled guilty. It wasn't a trial. It was a guilty plea. You're talking about 2015. Yes. Yes, Your Honor. And so I understand your point. You're saying the 2005 information wasn't available in 2015? Barber was not available to testify as an exculpatory witness in 2015 when Wolf pled guilty. What's changed at habeas is he is available and he's offering his exculpatory testimony. Because that was still the time when he was saying, I will take the Fifth. I'm not going ‑‑ Yes, he had done that twice already in federal court and state court. He had done that twice already. And there was no offer of immunity, at least nothing on the record. Never, and I think we showed in our briefs that state law, under Virginia state law, you can't compel a witness in this circumstance over his good faith Fifth Amendment objection. They never responded to that, but we showed that. Because Virginia law only permits use immunity, not derivative use immunity. So Barber could not have been fully protected if he was compelled to testify. Are you saying then our discussion of that point in the 2013 opinion was erroneous? I think it was not as precise as it could have been. Yeah, that's what I would say. You're trying to be gracious there. Yes, well, yes. That's good. We said he could get immunity. You don't know until you have a trial. We were talking in terms of theoretical ‑‑ Put him on the witness stand and see if they can get him to talk. Yeah, it was theoretically possible that his lawyer could have asked Barber to agree to a bad deal that wouldn't have immunized him, so you were right. It was theoretically possible. You just said you can get use immunity. Yeah, but that would not have been any good for Barber. That wouldn't have been enough? He was worried about ‑‑ That's all you can get in the federal court system. That's all you can get in the Supreme Court? You're saying that's enough immunity to make somebody talk? Well, not ‑‑ so the law in Virginia is when compelled, the witness must be fully protected. Use immunity for Barber would not have done him any good. He was worried about being tried for perjury based on his prior testimony, like habeas. But you can compel somebody to testify with use immunity. So I understand your point, Your Honor, but I think we cited cases from the Virginia Supreme Court that are to the contrary. It sounds to me like Virginia law is the same as federal law. Under Virginia law, a Fifth Amendment invocation is respected, even under an offer of use immunity, if that use immunity would not fully protect the testifier. That's the standard. Any more questions, Your Honors? You have reserved some time. Okay, thank you. We'll get you back up here. Mr. Curry. Good to have you with us, Mr. Curry. It's a pleasure to be here. Good morning, Your Honors. May it please the Court, Liam Curry on behalf of the appellee in this matter. If I may, I know we've just heard a lot of arguments that seemingly relate to the underlying merits of the habeas claims that were raised in Mr. Wolf's amended petition. The issue on appeal concerns the two questions that were resolved in the district court concerning what constitutes new, reliable evidence of actual innocence. First, this court is tasked with determining what standard should apply. And in the district court, the two standards that were being considered were evidence that was either newly discovered or evidence that was considered newly presented. It is our position here in this court today that no matter what standard is applied to Mr. Barber's 2023 declarations, they are not new for the purposes of establishing actual innocence through the Shloop Gateway. And so I would disagree with my opposing counsel's contention during his own argument. Mr. Barber's testimony wasn't available to Mr. Wolf back in 2015, was it? Your Honor, my answer to that would be it's purely speculative. The availability of Mr. Barber's testimony would depend on whether he is called as a witness at trial. Well, based on his declaration, he himself says, and he's repeatedly said, that he would have taken the Fifth. In fact, he had taken the Fifth before. And his attorney says there was no hope or offer of immunity forthcoming. Was there? And if there was, where is that in the record? I don't think there is anything in the record to that point, Your Honor. But to address this question about – That's uncontradictive. Can you repeat the question? He said, well – That there's nothing in the record about – That the government offered immunity. That's correct, Your Honor. Right. So there was no immunity available, so he was going to take the Fifth. So that makes – that is what, at least they argue, makes this new declaration new. Well, I think the problem with that argument is that this newly available standard, as far as I am understanding, it does not exist. The case law that I have seen that talks about evidence that is newly available, it talks about evidence that had not been discovered at trial, and therefore was not available for the witness – or for the defendant to put before the court. And that is not the – that is considered a tougher standard, right, because they have to show that they had made some efforts and that they were unable to discover this evidence and put it before the court. The lesser standard is newly presented. And that – under that standard, anything that constitutes new reliable evidence can come in as long as it was not presented to the finder of fact. Now, the district court found that that was a distinction without a difference under the specific facts of this case because the evidence of actual innocence was not new under any reasonable definition of the term. If I could turn the court's attention to Barber's 2023 declaration, because I think it bears repeating to the panel, the task today is to determine whether there is evidence of factual innocence sufficient to undermine confidence in the convictions that Mr. Wolf currently has. Right. And so Mr. Barber saying he didn't do it is evidence that – arguably evidence that would have turned the tide. Well, their position is that it is reliable evidence of that. Oh, it's not just their position. The district court found him credible. The district court found him credible under a different universe of facts. Why does that matter? We're talking about Judge Jackson's ruling that he was credible? Right. And again, I want to emphasize that I feel like we're conflating the reliability. His testimony at that point is consistent. His testimony before Judge Jackson was consistent with the declaration of 2023. That is correct. On the crucial point of whether Wolf was involved in the murder. That is correct, Your Honor, and that is relevant to the district court. In both of them, the witness, Barber, says I was the trigger man. I did it, but didn't – isn't that right? I was the trigger man, which is different, though, that he testified at the trial that Wolf was involved. So he repudiated before Judge Jackson, and he repudiated in this declaration what he had said at the trial. He's exculpated Wolf. No, I understand, and that is a point that they are making in support of the reliability evidence. If his testimony in this declaration and before Judge Jackson is true, then Wolf is in it. If it is true, yes. If it is true and Judge Jackson credited it, the district judge. What Judge Jackson was concerned about was whether he was presented with credible testimony that, if true, would undermine the capital murder conviction based on murder for hire because Barber was the key witness to supply that testimony for the convictions that were being reviewed at the time of Judge Jackson's ruling. We are in a different factual universe right now. Why? Why? You've said that a couple of times now. I don't understand why. Because those convictions have been vacated, Your Honor. He requested that relief and received it. No testimony of Barber was relied upon or even necessary for the convictions that he is challenging here. Because he pled guilty. Because he pled guilty, Your Honor. Because he presented a proffered and agreed statement of facts as to the true version of events. Because he wrote a written confession detailing his own obligations or his own responsibility for the death. I know an argument has been presented that this was some sort of obligation of the plea agreement, but we can read the written confession itself to cast aside that notion. It says, my attorneys asked me to write a statement about my involvement. Yeah, but opposing counsel is saying that if they had an evidentiary hearing, they would present evidence that that also was coerced by the government as they've coerced everything in this case from the inception. I mean, I think there's two . . . there's a point that I've been trying to make about . . . It's not contested that there was witness intimidation here, is it? It's absolutely contested. I mean, that'll be the factual basis of a hearing if he overcomes the . . . I've listened to the audio of the interview. Have you listened to it? I have read the transcript. No, listen to it. I don't know. I don't think I have. No, I have not listened to the transcript. I'm sorry, I have not listened to the audio at this point because I think it's premature. We're dealing with the question of passing through the Schlup actual innocence gateway. And one point I've been trying to make is that there are questions about reliability. Right, but doesn't witness intimidation go to reliability? I know you're going to argue he goes . . . or I expect you're going to argue that he can't be reliable because he changes his story so many times, but he changes . . . I think opposing counsel would argue that he changes his story so many times because of the intimidation by the government. No, Your Honor, the point that I'm trying to make is that it's not new. When they're making the argument that it's reliable because Barber has presented this testimony in the past and it has been found to be credible, all of that occurred prior to the guilty plea. It is still a requirement of Schlup that they . . . Right, and then this goes back to them saying it's his availability that is new, and your argument there is that that's not a thing. We're not looking about . . . Availability. We're not looking at availability. We're not looking about admissibility of any of this evidence. This is about him building a record of new evidence of his actual innocence. This is a . . . the Schlup standard is intentionally high. It needs to be . . . I'll read to the Court some of the language that the cases often use. It requires . . . it's a confined category limited to certain exceptional cases that involve a compelling claim of actual innocence. Such claims are extremely rare and would require a showing based on the totality of the evidence that it would prevent any reasonable juror from finding him guilty. And so if we can set aside the reliability aspect, this evidence has to be new, and there are a number of definitions about what new can be, and that is part of this Court's role in preserving and addressing this appeal. But the lowest standard that I can imagine, the lowest hurdle that he can clear, is to just show that the substance of the actual innocence claims that Barber has presented were not presented to the trier of fact, and that is just not the case. At the guilty plea hearing, both parties agreed to a proffered set of facts. The proffered set of facts included the fact that Barber has recanted his testimony. There was a detailed airing of the facts that have shown . . . that gave the trial court, who was sitting as the finder of fact, the ability to assess whether Barber . . . or whether it should accept the findings of guilt that are being . . . or the evidence of guilt that's being presented in light of the fact that Barber had recanted. All of that was put before the trial of court. And the trier of fact had no problem entering a finding of guilt, based on Barber's . . . based on Wolf's statements that his pleas were voluntary, based on his statements that he had admitted that the proffer of facts was true and accurate, based on this letter that he wrote on his own volition. As he says in the letter, he's . . . it's not addressed to the court. It's addressed to the victim's family. And he says, saying I'm sorry, it's . . . it's a quote. Maybe it seems easy for me to say I'm sorry, but it's actually the hardest thing I've ever done, because I have to admit what I did, which contradicts what I said at trial . . . and the position that I've taken on all of my appeals, which I think includes all of the habeas litigation. He says, but I want you to know the truth, and that's why I am writing this. So that is part of the factual innocence calculus that the court has to consider. The court needs to consider the fact that he's confessed in a detailed way. It's not a partial confession. It is a total confession to his involvement. The court has to consider his guilty plea. The court has to consider the proffered statement of facts. And the court, I think, has to consider, as a threshold manner, that because the proffer detailed extensively Barber's vacillations, I believe is the word that the district court did, in terms of what his version of the story was, that is all part of the analysis. And the district court found, look, it may have seemed reliable in 2013, or in 2012, that Barber's account, but in light of the fact that there's been a confession, a total confession, a guilty plea, and a proffer, nothing there is new. It's not new under any definition. But can the district court make a determination of credibility without having conducted an evidentiary hearing? Well, I think what the court, what it said was that based on the fact that Barber has told so many different sides of the story, that this, you know, I think it was kind of weighing it against the facts of the case, as I was just describing. You know, the fact that there's been like a paradigm shift in light of the guilty plea. Because when we have . . . Right, but normally we defer to a district court's credibility finding because the district court has the witness in front of her and can assess credibility based on demeanor and other factors that are in front of the court. Here, the credibility determination, if you can call it that, was based on paper that is in front of us as well, on appeal. Well, it's my understanding of the record that there was . . . I mean, I don't . . . If the court takes any issue with the fact that a determination of credibility was made based on the fact that Barber, you know, based on the fact that he's told many versions of the story, the district court's . . . How did he say he told many versions of the story? I'm sorry? I thought there was only two versions of the story. And in one of them . . .  And there's only two versions of the story that Barber told. And part of it was always consistent. It was always consistent that he pulled the trigger. Correct? Yes. And the only thing that varied was whether Wolfe was involved. That's correct, Your Honor. And he had testified at Wolfe's trial that Wolfe was involved. And he had repudiated that before Judge Jackson, when Judge Jackson saw him and listened to him and said he's credible. Right. And that's what he says in the 2023 declaration. Wolfe was not involved. But he didn't deny his own involvement. So you say many versions. Right. There's really only two versions. No, and I . . . And 50% of that is consistent. I perhaps spoke inartful, Your Honor. I wasn't trying to convince this panel that he's told more than two versions. I was simply referencing the fact that . . . You said many versions. He told many versions. What I was . . . And Judge Berger pointed out, apparently he didn't testify at all in the state court proceedings in 2015. No, there was no trial in 2015 or 2016. There was no . . . He didn't testify at all. He testified live before Judge Jackson, where he got relief, as you . . . where Wolfe got relief. No, Your Honor. I did not intend to mislead the panel into believing that he had told more than two versions. I was simply referring to the fact that he has vacillated back and forth between the two, beginning in 2005. Well, he's vacillated back and forth. He told . . . He's been consistent between 2005 and now. In 2023, he says Wolfe . . . Well, after 2005 . . . Right. Had nothing to do with the killing. That's what he says. After 2005, I believe he drafted an affidavit in which he repudiated his recantation. And then he swore out new affidavits. And then prior to . . . That was because, as he says in his declaration in 2023, that he felt he had to choose between falsely testifying against Wolfe or dying, because he was threatened with the death penalty. Well, no, I understand that that is his position, Your Honor. But the fact that . . . Was he threatened with the death penalty? He was reminded of the terms of his agreement. That . . . I'm talking about Barber. Was Barber threatened with the death penalty? Your Honor . . . You said you read the transcript of that. Did they tell him if he didn't stick to his story that the death penalty would be back on the table? That is my recollection, as it would be consistent with what he had agreed to do. But, Your Honor, the point that I'm trying to make here is about new. And when we're talking about what is the . . . He needs new allegations of factual innocence, not new allegations of misconduct during his trial. And, of course, so what we need is something new. I think that the Schlupe standard contemplates like a hypothetical situation. The fact finder has adjudicated him guilty based on the facts that were presented. To prevail on Schlupe, he must present that theoretical fact finder with new facts, reliable facts of his actual innocence. Well, he doesn't need new allegations. He needs new evidence. Your allegations can be the same. The evidence to support your allegations might be different. And what he's saying is that this evidence to support his allegation of innocence is new because now it's newly available. Well, I've already presented the arguments that there is no newly available standard. It is about whether this was something that was presented to the fact finder or not. And the substance of his actual innocence allegations is that Barber has recanted his trial testimony. That was known to him in 2016. If we look at the 2023 declaration, the events, the final section, which contains the actual innocence allegations, he says you can just read my former affidavits in my trial testimony. So in his own words, he's saying I'm not presenting anything new here in terms of actual innocence. My story is what it was in 2010, in 2005. So the Schlup standard is trying to contemplate something that is new that would upset the balance, not of his trial in 2002, but the balance of the guilty plea. And there's nothing new. This was presented. The things that he's talking about, the substance of his statements in 2005 and in 2010, that was undeniably presented to the state court, to the finder effect. So it's not even a hypothetical situation. We don't have to wonder whether the fact that Barber believes that Wolfe wasn't involved, we don't need to wonder about how that would have affected a theoretical fact finder. It went to the actual fact finder. The fact finder was not convinced by it. The fact finder was convinced by Wolfe's own sworn statements under oath, his confession, that they voluntarily drafted, voluntarily submitted to the court, and had it admitted as defense exhibit two. That's how strongly they believed in presenting that true factual record to the finder effect. I see my time is up. I'll gladly answer any other questions of the panel. Otherwise, I'd ask the court to affirm the district court's ruling. Thank you very much, sir. Thank you. Mr. Abeles? Thank you, Your Honor. So there was some question presented by counsel for the state here. What is Mr. Abeles talking about with this newly available standard? So I'm quoting from page eight of our opening brief, Royal v. Taylor, one of this court's cases, which itself is quoting Sloop. It says, under Sloop, a gateway innocence claim should be evaluated, quote, in light of all available evidence including that considered unavailable or excluded at trial and any evidence that became available only after trial. The gateway innocence claim should be evaluated, quote, in light of all available evidence including that considered unavailable or excluded at trial and any evidence that became available only after trial. That's why we're citing this standard. That's the basis. And counsel here said it was purely speculative as to whether it was available. Well, you don't even have to look at anything else. That means it wasn't reasonably available. If I tell you, yes, what's your calendar? Well, it's purely speculative whether I'm available in May, Your Honors. That's different than saying I'm reasonably available in May. Well, and far different than pleading the fifth, right? I mean, that's in your favor that he was pleading the fifth. He wasn't available at all. Yes, exactly. But what about Mr. Curry's point that at the end of the 2023 declaration, Barbara says something to the effect of just read my former affidavits and trial testimony. So, again, if the testimony needs to be newly discovered, it didn't exist in the universe before habeas, that's going to work out well for this team. We cannot come in here and say we never heard of this testimony until 2023. That's not true, okay? So, yes, so first of all, that's not all he says. He does spell out the story, what happened, that Justin is innocent. But, yes, he does summarize and attach all his prior declarations. I could have to talk to his attorney, but I think for efficiency, that's all. And for reasons of, I would argue, if I was his attorney, credibility and reliability. Yes. I've said this consistently since 2005. For the last 20 years, I've been saying this. Thank you. I agree. And that goes back to his argument that then it's not new. Yes, but we have different definitions, and that's what will be decided here as to what new means. But I think if you look at Schlup, Royal v. Taylor, House v. Bell, you'll come to agree with me. Thank you, Your Honors. Oh, do you have any further questions? I don't. Thank you very much. Thanks. Good to have you with us. We're going to come down in Greek Council and then go to the next case.
judges: Robert B. King, Stephanie D. Thacker, Nicole G. Berner